Richard THORSEN, Respondent,

v.

SACHS ELECTRIC COMPANY, Appellant,

TRINITY LUTHERAN HOSPITAL, Defendant.

No. WD 59175.

Missouri Court of Appeals, Western District.

Aug. 14, 2001.

David A. Masters and Lesa L. Bonnett, Macon, for Respondent.

Roland P. Walker and Bruce Farmer, Columbia, for Appellant.

Before SMITH, P.J., and SMART and HOWARD, JJ.

HOWARD, Judge.

Employer Sachs Electric Company ("Sachs") appeals from the decision of the Labor and Industrial Relations Commission ("the Commission") awarding workers' compensation benefits to its employee Richard Thorsen for an arm injury.

Sachs brings three points on appeal. First, it alleges that the Commission erred in finding a causal connection between Mr. Thorsen's injury and an accident that occurred on September 27, 1994. Second, it alleges that the Commission erred in awarding temporary total disability benefits ("TTD") to Mr. Thorsen. Third, it argues that the trial court lacked jurisdiction under § 287.140[1] to award Mr. Thorsen medical expenses incurred at Trinity Lutheran Hospital.

We affirm.

### Background

In 1994, appellant Sachs employed Mr. Thorsen as a journeyman wireman electrician. On September 27, 1994, he was working at the Associated Electric Power Plant north of Moberly, Missouri. He was standing on a flatbed truck, which was missing several boards from its deck, helping to guide large light pole sections ("standards") onto the trailer. In an attempt to avoid one standard that was being loaded onto the trailer, he tried to jump over another standard. In doing so, his left leg went through a hole in the floor of the trailer. As he fell, he grabbed for a standard to catch himself. He experienced immediate pain from a scrape he sustained to his left thigh and a bump to his knee, but he continued working. By 4:30 p.m., while attending a union meeting, Mr. Thorsen noticed that his left arm was swollen from the wrist up past the elbow and was turning black and blue. He reported this to his foreman, who directed him to go to the hospital the next morning.

Mr. Thorsen reported to the Moberly Regional Medical Center emergency room ("Moberly ER") the next day. After an x-ray returned negative for a possible fracture to the left elbow, the doctor diagnosed an injury to Mr. Thorsen's left arm and prescribed anti-inflammatory medication and an ice and heat regimen. Mr. Thorsen returned to work on light duty.

On October 31, 1994, Mr. Thorsen returned to the Moberly ER. There, Dr. Fennel recorded Mr. Thorsen's history, which included an explanation of Mr. Thorsen's accident and resulting arm injury on September 27, 1994. Dr. Fennel also noted that Mr. Thorsen reported to him that "several days [earlier], [Mr. Thorsen] caught himself on a ladder that he was sliding down with his arm and it pulled causing a lot of pain and a lot of discomfort." Dr. Fennel diagnosed a "probable partial muscle tear" to the left arm and took Mr. Thorsen off of work until he could see Dr. Turnbaugh, an orthopaedic surgeon.

On November 2, 1994, Mr. Thorsen had his first appointment with Dr. Turnbaugh. Dr. Turnbaugh prescribed physical thera-

---

**1.** Unless otherwise noted, all statutory references are to RSMo 1994. We note that § 287.140 was amended in 1998. That amendment was to a subsection not at issue in this case. Thus, for simplification purposes, all references to § 287.140 in this opinion will be to RSMo 1994.

py. As his pain continued, Mr. Thorsen returned to see Dr. Turnbaugh several times more. On December 14, 1994, Dr. Turnbaugh placed Mr. Thorsen on a "no work" order and referred him to Dr. Allen.

On January 6, 1995, Mr. Thorsen first saw Dr. Allen, who diagnosed a partially ruptured biceps muscle. Dr. Allen kept Mr. Thorsen off of work and referred him to additional physical therapy. The pain and discomfort in his arm lingered despite the therapy and conservative treatment, so Dr. Allen referred him to a specialist. Sachs' workers' compensation insurer, which furnished a nurse to assist Mr. Thorsen with attendance at appointments and to monitor his progress, then stepped in. Rather than the specialist recommended by Dr. Allen, the nurse scheduled Mr. Thorsen to see Dr. Clark.

On April 24, 1995, Mr. Thorsen saw Dr. Clark. Although describing the incident in which Mr. Thorsen fell through the trailer in his patient history, Dr. Clark referenced the date of injury as October 26, 1994, which was the date of the ladder incident. Her records also reflect that the slip on the ladder occurred on December 15, 1994. After an MRI of Mr. Thorsen's arm returned negative for a biceps tear or any other injury thought to cause his symptoms, Dr. Clark prescribed additional physical therapy and eventually a work-hardening program. After a week, Mr. Thorsen left the work-hardening program as it was exhausting him and causing him more pain. On June 13, 1995, shortly after he left the work-hardening program, he returned to see Dr. Clark. Dr. Clark did not feel there was anything further she could do to treat Mr. Thorsen, so she released him to return to work despite his complaints of continued pain.

Dr. Clark opined that Mr. Thorsen had reached maximum medical improvement, so on June 11, 1995, Sachs halted Mr. Thorsen's TTD checks. Mr. Thorsen thereafter performed intermittent light-duty work as it became available with Sachs until December 10, 1995, when Sachs no longer provided TTD or offered any light-duty work.

Although Mr. Thorsen had been released from medical care, the condition of his left arm continued to worsen. In January of 1996, despite Sachs' refusal to authorize any additional medical treatment or TTD, Mr. Thorsen returned, at his own expense, to see Dr. Turnbaugh. Dr. Turnbaugh, who suspected radial nerve entrapment, referred Mr. Thorsen to Dr. Mackinnon, who suspected a "radial tunnel problem" and recommended an EMG.[2]

On October 16, 1996, Mr. Thorsen chose to obtain the EMG at his own expense. The results of this EMG were "considered equivocal."

On November 7, 1996, Mr. Thorsen continued to experience pain and discomfort in his left arm, yet Sachs still refused to authorize additional medical treatment. Mr. Thorsen then went to Dr. Stitzer, his family physician. Dr. Stitzer suggested he see Dr. Seaberg, a hand surgery specialist. Dr. Seaberg diagnosed a "tear of the left biceps tendon on insertion into the forearm." Dr. Seaberg referred Mr. Thorsen to Dr. Satterlee, an orthopaedic surgeon in Kansas City.

On February 27, 1997, Mr. Thorsen had his first visit with Dr. Satterlee. Dr. Satterlee ordered a new MRI and confirmed a partial biceps tear at the left elbow. He then explained Mr. Thorsen's options to him, including surgery. After considering all options, Mr. Thorsen elected to proceed

**2.** According to Mr. Thorsen's medical records, an EMG, or "electromyographic examination," is used to evaluate the function of and/or detect injury to the nerves.

with surgery. Despite several requests from Mr. Thorsen, Sachs continued to refuse authorization of any further medical treatment.

Nonetheless, Mr. Thorsen chose to proceed with treatment. On August 12, 1997, Dr. Satterlee surgically repaired Mr. Thorsen's biceps rupture at Trinity Lutheran Hospital. Thereafter, Mr. Thorsen successfully attended physical therapy and a work-hardening program. On February 9, 1998, Dr. Satterlee released Mr. Thorsen to return to work with restrictions that he could not climb ladders or work alone. Mr. Thorsen returned to work as a journeyman electrician. As of the final hearing, he continued to have some problems with his arm, which he said would never be quite the same as prior to the accident.

Mr. Thorsen filed his first claim for compensation with the Division of Workers' Compensation on March 24, 1995. In this claim, he reported the injury resulting from his fall into the hole in the truck bed. However, he stated the date of injury as October 26, 1994—the date of the ladder incident. At a hearing on June 7, 1996, in which Mr. Thorsen requested additional medical benefits after Dr. Turnbaugh recommended an EMG, the Administrative Law Judge ("ALJ") stated the date of injury as October 26, 1994. Mr. Thorsen's counsel then advised the court that although the claim said October 26, the proper date was September 27, 1994. Counsel advised the court that it was through counsel's error, not that of Mr. Thorsen, that the date of injury was incorrectly reported on the claim form. The court advised counsel that it would "receive something in writing" with regard to what the date of accident was, but otherwise the October 26, 1994, date would remain with Mr. Thorsen's counsel's representation that it was actually September 27, 1994. On July 23, 1996, rather than

filing an amended claim, Mr. Thorsen's counsel filed a separate claim reflecting the September 27, 1994, date of accident. Except for the date of accident, the claim forms were essentially identical; i.e., the description of the injury-causing accident was identical. As will later be seen in this opinion, this filing error played a large role in the resulting issue as to which incident, that of September 27, 1994, or October 26, 1994, caused his injuries.

A final hearing was held before the ALJ on October 8, 1999. The following issues were presented to the ALJ: (1) Sachs' liability for TTD, (2) Sachs' liability for reimbursement of medical expenses, (3) Sachs' liability for unpaid medical expenses, (4) the nature and extent of permanent disability, (5) Sachs' liability for mileage expense, (6) Sachs' liability for attorney's fees and claim expenditures, (7) Sachs' liability on the Trinity Lutheran Hospital bill, and (8) the causal connection between the September 27, 1994, accident and the injuries that Mr. Thorsen alleged he sustained.

Prior to the start of the hearing, counsel for Mr. Thorsen announced that the claim for October 26, 1994, was being abandoned, so it was dismissed with prejudice. Up to that point, medical benefits of $7,547.76 and temporary disability benefits in the amount of $12,179.16, were on record as having been paid in connection with the October 26, 1994, claim. Mr. Thorsen's counsel informed the ALJ that Mr. Thorsen was not making a claim for a new injury, the October incident had simply caused a flare-up. Sachs, on the other hand, proceeded on the theory that the October incident was a second accident and the actual cause of Mr. Thorsen's injury. Because Mr. Thorsen had dismissed his October claim with prejudice, Sachs alleged that he was seeking compensation for a non-compensable injury. As pointed

out by the ALJ at the beginning of the hearing, the central issue underlying a lot of the other issues was whether the October 26, 1994, incident resulted in a new injury or just a flare-up of that caused by the September 27, 1994, accident. Mr. Thorsen testified and his medical records were introduced in addition to the deposition testimonies of some of his treating doctors.

The ALJ found that Mr. Thorsen failed to carry his burden of proof that his injuries arose from the September 27, 1994, accident rather than the October incident, and Sachs was therefore not liable for his injury. Mr. Thorsen then sought review of the ALJ's decision, and the Commission reversed. This appeal followed.

### Standard of Review

■ Section 287.495.1 RSMo 2000,[3] which governs our review of the Commission's decision, states in relevant part that:

Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

Accordingly, we review the findings of the Commission and not those of the ALJ. *Sutton v. Vee Jay Cement Contracting Co.,*

37 S.W.3d 803, 807 (Mo.App. E.D.2000). We examine the Commission's fact determinations by considering the record in a light most favorable to its decision, deferring to the Commission on issues of credibility and the weight given to conflicting evidence. *Williams v. DePaul Health Ctr.,* 996 S.W.2d 619, 625 (Mo.App. E.D. 1999). On the other hand, if Sachs' challenge to the Commission's decision rests on the interpretation or application of law rather than determinations of fact, we are not bound by the Commission's decisions; those issues are subject to our review and correction if necessary. *Id.* We may also review the Commission's ultimate fact findings that arise through the applications of rules of law, "rather than by natural reasoning based on facts alone," because such are deemed conclusions of law. *Id.*

■ "Moreover, when as here the Commission reverses the findings and award of the ALJ, we engage in the two-step analysis set forth in [this court's] *en banc* decision in *Davis v. Research Medical Ctr.,* 903 S.W.2d 557, 570 (Mo.App. W.D.1995)." *Id.* In *Davis,* Judge Ellis set forth the following two-step analysis:

First, the reviewing court examines the record, together with all reasonable inferences to be drawn from the evidence therein, in the light most favorable to the findings and award of the Commission to determine whether they are supported by competent and substantial evidence. If so, the reviewing court must then determine whether the Commission's findings and award, even if supported by some competent substantial evidence, were nevertheless clearly contrary to the overwhelming weight of the evidence contained in the whole record before the Commission. In other words, the factual findings and resulting award

---

**3.** All references to § 287.495 are to RSMo 2000.

of the Commission should be set aside on appeal if they are not supported by competent and substantial evidence or, even if supported by such evidence, if they are clearly contrary to the overwhelming weight of the evidence. Otherwise, the Commission's award is to be affirmed.

*Davis,* 903 S.W.2d at 565 (citations omitted). This analysis was "designed to determine whether the Commission could have reasonably made its findings and award upon consideration of *all* the evidence before it." *Id.* (emphasis in original). In summary, we first review the evidence and reasonable inferences drawn therefrom in a light most favorable to the award; if we determine that the findings and award are supported by competent and substantial evidence, we move to the second step. *Id.* At this point, we consider *all* evidence in the record, regardless of whether it does not favor the award, in order to determine if the findings and award must be reversed as clearly contrary to the overwhelming weight of the evidence. *Williams,* 996 S.W.2d at 625.

### Point I

In its first point on appeal, Sachs contends that the overwhelming weight of the evidence does not support the facts concerning Mr. Thorsen's injury as found by the Commission. Instead, Sachs claims that the evidence supports the ALJ's finding concerning Mr. Thorsen's failure to causally connect his injury to the September 27, 1994, accident.

Section 287.120.1 provides in pertinent part that:

Every employer . . . shall be liable, irrespective of negligence, to furnish compensation . . . for personal injury . . . of

the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefor whatsoever, whether to the employee or any other person.

At issue is whether Mr. Thorsen's injury was caused by the September 1994 accident in which he fell through the floor of the truck or the subsequent October 1994 ladder incident.

 In order to receive compensation, Mr. Thorsen was required to show a causal connection between his biceps tear and the September 27, 1994, work incident where he fell through the floor of the truck. *Williams,* 996 S.W.2d at 631. "[M]edical causation of injuries which are 'not within common knowledge or experience, must be established by scientific or medical evidence showing the cause and effect relationship between the complained of condition and the asserted cause.'" *Irving v. Mo. State Treasurer,* 35 S.W.3d 441, 445 (Mo.App. W.D.2000) (quoting *Brundige v. Boehringer Ingelheim,* 812 S.W.2d 200, 202 (Mo.App. W.D.1991)). Although all doubts should be resolved in favor of the employee and coverage in a workers' compensation proceeding, if an essential element of the claim is lacking, it must fail. *White v. Henderson Implement Co.,* 879 S.W.2d 575, 577 (Mo.App. W.D. 1994).

Sachs argues that "the Commission misapplied the law because Thorsen had the burden of proving that the injury for which he claimed compensation, a torn or ruptured biceps, occurred on September 27, 1994." Sachs contends that Mr. Thorsen failed to present evidence *excluding* that his injury did not occur on October 26, 1994.[4]

---

4. We note that Sachs relies on the ALJ's findings and argues for their appropriateness throughout his argument, but we review the Commission's findings and award, not the ALJ's decision. § 287.495.

■ A review of the record in the light most favorable to the award establishes that there is indeed substantial, competent evidence to support the Commission's finding that Mr. Thorsen satisfied his burden of proof that his torn biceps tendon and the need for medical treatment resulted from the September 27, 1994, accident at work. The Commission relied on Mr. Thorsen's testimony and the deposition testimony and records of Dr. Satterlee and Dr. Turnbaugh in finding causation. Although he was sometimes confused about exact dates when he testified several years after the accident, Mr. Thorsen clearly stated that he had continual problems with his left arm, all of a similar nature, since he fell through the truck bed and tried to catch himself. He did not deny the slip on the ladder, but insisted that the incident had only aggravated his injury sustained when falling through the truck bed. Dr. Satterlee, who performed Mr. Thorsen's surgery, wrote in a letter of June 15, 1998, "it is my opinion within a reasonable degree of medical certainty that the accident of September 27, 1994 was the cause of the partial biceps tear and the reason I had to treat Mr. Thorson [*sic*]." This letter was a part of the record before the Commission. Also a part of that record were Dr. Turnbaugh's records and his deposition testimony. Dr. Turnbaugh's November 23, 1994, "summary sheet" clearly references the "Sep '94" fall through the deck of the truck resulting in a torn left biceps muscle. This evidence is substantial and competent.

■ We still must determine whether the Commission's findings and award were clearly contrary to the overwhelming weight of the evidence. We therefore consider the evidence in the *whole* record, including that contrary to the award. Sachs contends that, contrary to the award, the overwhelming weight of the evidence shows that Mr. Thorsen did not suffer a partial tear of his biceps on September 27, 1994. Or, as stated by the Commission in its findings, "[e]mployer/insurer would have us believe that whatever injury claimant suffered as a result of the September 27, 1994 incident, it had completely resolved when he suffered a second work accident in October 1994."

■ This issue involves Mr. Thorsen's burden of proof, which has been described as follows:

> Employee bears the burden of proving that not only did an accident occur, but it resulted in injury to him.... Employee's medical expert [is required] to establish the probability Employee's injuries were caused by the work accident. The ultimate importance of the expert testimony is to be determined from the testimony as a whole and less than direct statements of reasonable medical certainty will be sufficient.

*McGrath v. Satellite Sprinkler Sys., Inc.*, 877 S.W.2d 704, 708 (Mo.App. E.D.1994) (citations omitted). Sachs maintains that Mr. Thorsen did not meet this burden.

■ In its argument, Sachs relies primarily on the findings of the ALJ, especially those regarding credibility. In the second step of the *Davis* analysis set forth above, "the ALJ's credibility determinations [of live witnesses] that are contrary to the Commission's credibility determinations are considered." *Whiteman v. Del-Jen Constr., Inc.*, 37 S.W.3d 823, 833 (Mo. App. W.D.2001). However, "[w]here witnesses testify only by deposition and do not appear live before the ALJ, the Commission is able to determine the credibility of those witnesses" from the written record just as well as the ALJ, so this court defers to the Commission with regard to credibility determinations of deposition testimony. *Id.*

In this case, the medical testimony was presented by way of deposition testimony and medical records. Dr. Turnbaugh and Dr. Satterlee related Mr. Thorsen's injuries directly to the September 27, 1994, accident, but Dr. Clark insisted that there was no causal link. Sachs points to the fact that the ALJ found that Dr. Turnbaugh's testimony lacked credibility with regard to causation. At Dr. Turnbaugh's deposition, counsel for Sachs questioned Dr. Turnbaugh concerning the October incident where Mr. Thorsen reported to the emergency room doctor that he had caught himself with his arm on a ladder he was sliding down causing a lot of pain and discomfort in the arm. When counsel inquired whether Dr. Turnbaugh would interpret that as a new and separate injury, he responded, "possibly, yes." The ALJ apparently based its credibility finding on this. However, as the Commission found in its award:

> Dr. Turnbaugh's admission that a new injury *might* have arisen from the subsequent incident demonstrates only that he has considered other possibilities. It does not necessarily detract from his ultimate conclusion that the September 1994 incident was the cause of claimant's problems. It is elementary that claimant does not have to prove his case with absolute certainty. Causation only needs to be made with reasonable probability.

(Emphasis added.) Again, Dr. Turnbaugh's testimony was by deposition, so we defer to the Commission on its finding that Dr. Turnbaugh causally connected Mr. Thorsen's injury to the September 27, 1994, accident. *Whiteman*, 37 S.W.3d at 833. Moreover, the weight to be accorded expert testimony on medical causation is exclusively within the province of the Commission. *Landers v. Chrysler Corp.*, 963 S.W.2d 275, 282 (Mo.App. E.D.1997).

The Commission also found that Dr. Satterlee, in his July 15, 1998, letter set forth above in our discussion of the first step of the *Davis* analysis, supports Mr. Thorsen's case. We agree. Sachs maintains in its brief that Dr. Satterlee related the injury to the September incident only because that was the only incident that Mr. Thorsen reported to Dr. Satterlee. We find nothing in the record to support this belief. Sachs also argues, without citation, that Mr. Thorsen bore the burden of excluding all injuries or disability suffered as a result of the October 26, 1994, incident. Again, Mr. Thorsen's burden was to establish a connection between the September 27, 1994, work accident and his injuries. *White*, 879 S.W.2d at 577. His burden was not to establish the elements of his case on the basis of absolute certainty, but rather, he only needed to show the elements of his claim by reasonable probability. *Id.* " 'Probable means founded on reason and experience which inclines the mind to believe but leaves room for doubt.' " *Id.* (quoting *Fischer v. Archdiocese of St. Louis–Cardinal Ritter Inst.*, 793 S.W.2d 195, 198–99 (Mo.App. E.D.1990)). Mr. Thorsen satisfied his burden.

The remaining evidence contrary to the award includes the June 26, 1996, deposition testimony of Dr. Clark. Sachs deposed Dr. Clark after Mr. Thorsen requested authorization for additional medical treatment in 1996, over a year since Dr. Clark had last seen Mr. Thorsen. Dr. Clark testified that as of June 13, 1995, when she last saw him, Mr. Thorsen had reached maximum medical improvement and did not require further medical attention. Sachs used this testimony, which was the basis for Sachs' denial of any further medical treatment for Mr. Thorsen, to show that the partial biceps tear could not have resulted from the September 27, 1994, accident. How-

ever, the Commission found that Mr. Thorsen did establish the requisite causation. It found that even though Dr. Clark opined that Mr. Thorsen had reached maximum medical improvement, it was "apparent that [Mr. Thorsen] had not been properly treated." We again note that the weight to be accorded expert testimony on medical causation is exclusively within the province of the Commission. *Landers*, 963 S.W.2d at 282. It was up to the Commission to resolve the conflicting testimony, and it clearly resolved the conflict in favor of Mr. Thorsen. Under the circumstances, we conclude the Commission's medical causation determination is not against the overwhelming weight of the evidence.

Point I is denied.

## Point II

In its second point on appeal, Sachs contends that the Commission erred in awarding Mr. Thorsen temporary total disability ("TTD") because the Commission's finding that Mr. Thorsen was unable to work was not supported by the overwhelming weight of the evidence. Specifically, Sachs alleges that Mr. Thorsen demonstrated his ability to work, and therefore his disqualification for TTD, when he applied for unemployment benefits.

■■■■ When an employee is injured in an accident arising out of and in the course of his employment and is unable to work as a result of his or her injury,

§ 287.170 sets forth the TTD benefits an employer must provide to the injured employee. Section 287.020.7 defines the term "total disability" as used in workers' compensation matters as meaning the "inability to return to any employment and not merely mean[ing the] inability to return to the employment in which the employee was engaged at the time of the accident." The test for entitlement to TTD "is not whether an employee is able to do some work, but whether the employee is able to compete in the open labor market under his physical condition." *Boyles v. USA Rebar Placement, Inc.*, 26 S.W.3d 418, 424 (Mo.App. W.D.2000). Thus, TTD benefits are intended to cover the employee's healing period from a work-related accident until he or she can find employment or his condition has reached a level of maximum medical improvement. *Id.* Once further medical progress is no longer expected, a temporary award is no longer warranted. *Id.* Mr. Thorsen bore the burden of proving his entitlement to TTD benefits by a reasonable probability. *Cooper v. Med. Ctr. of Independence*, 955 S.W.2d 570, 574–75 (Mo.App. W.D.1997).

■■■■ Sachs maintains that Mr. Thorsen's application for and receipt of unemployment benefits essentially estops the Commission from awarding TTD to him. The following time line is helpful in assessing Sachs' claim that the Commission wrongly awarded TTD benefits:

| | |
|---|---|
| 6/13/95: | Dr. Clark assesses Mr. Thorsen as having reached maximum medical improvement ("MMI"). |
| 7/3/95 to 7/7/95: | Mr. Thorsen works (light duty). |
| 7/24/95 to 9/6/95: | Mr. Thorsen works (light duty). |
| 9/6/95 to 11/11/95: | Mr. Thorsen receives unemployment benefits. |
| 11/12/95 to 12/10/95: | Mr. Thorsen works (light duty). |
| 12/11/95 to 2/20/96: | Mr. Thorsen receives unemployment benefits. |
| *2/21/96 to 6/15/96:* | The Commission awards Mr. Thorsen TTD benefits. |
| 6/22/96 to 10/19/96: | Mr. Thorsen receives unemployment benefits. |
| *10/19/96 to 2/9/98:* | The Commission awards Mr. Thorsen TTD benefits. |
| 2/9/98: | Dr. Satterlee releases Mr. Thorsen as having reached MMI. |

Mr. Thorsen showed that he did not work or receive unemployment benefits during the time that the Commission awarded TTD benefits. Nonetheless, Sachs complains that the Commission's TTD award was inconsistent with Mr. Thorsen's work activity and his request for unemployment compensation. Specifically, Sachs alleges that the fact that Mr. Thorsen *was* able to work light duty and "had applied for and received unemployment benefits *immediately before*" and *"immediately after"* the period of June 22, 1996, to October 19, 1996, clearly demonstrates that he was indeed able to work. (Emphasis added.)

Under § 288.040.1 RSMo Cum.Supp. 1995,[5] in order to be eligible to receive unemployment benefits, the deputy must find that the applicant is required to show that he is able to work and is available for work. Sachs provided an exhibit showing the dates in which Mr. Thorsen drew the unemployment benefits. We found nothing in the record showing that Mr. Thorsen applied for unemployment benefits or was able to work light duty during the periods for which TTD was awarded. While Mr. Thorsen's potential ability to work *immediately before* or *immediately after* those periods is a factor which can be considered, of greater significance is his inability to work during those periods for which the Commission awarded TTD. As found by the Commission:

> Nothing in the record indicates that [Mr. Thorsen] was capable of working from February 21, 1996 through June 15, 1996 (16 and 3/7 weeks) and from October 19, 1996 until his release following surgery on February 9, 1998 (68 and 1/7 weeks). . . . We find claimant entitled to temporary total disability for the time

periods in 1996, 1997 and until his release in 1998, when he did not work and was not drawing unemployment.

Mr. Thorsen testified that, while under light-duty restrictions, he attempted to work, but he could only obtain work sporadically in 1995. He opined that no one would hire a "one-armed electrician." He was not released by the treating surgeon at the times for which he received TTD, and Dr. Satterlee indicated Mr. Thorsen was unable to work as a result of the September 27, 1994, injury until it was surgically repaired and rehabilitated. Although Mr. Thorsen's application for unemployment benefits is a factor to be considered, upon review of the record, we agree with the Commission and find that Mr. Thorsen sufficiently carried his burden of proof that he was unable to work as a result of his injuries and was still working toward attaining maximum medical improvement during the periods for which the Commission awarded TTD.

Point II is denied.

### Point III

In its third and final point on appeal, Sachs contends that the Commission erred in awarding Mr. Thorsen medical expenses incurred at Trinity Lutheran Hospital. Sachs asserts that the Commission lacked the jurisdiction to make such an award because the hospital had filed a medical fee dispute application and request for direct payment, thereby removing Mr. Thorsen as a party to the dispute concerning Trinity Lutheran Hospital's medical charges. Essentially, Sachs argues that we should reverse the Commission's medical expense award under § 287.495.1(1) because the Commission acted without power

---

5. Section 288.040 was amended in 1995, effective July 5, 1995, and again in 1997 and 1999. From the record, it appears that only

the 1995 amendment was applicable during the time Mr. Thorsen received unemployment benefits.

when it awarded Mr. Thorsen that portion of expenses related to his treatment at Trinity Lutheran ($12,490.67).

Section 287.140.1 requires that Mr. Thorsen be afforded and that Sachs provide all treatment necessary to cure and relieve the effects of his work-related injury. In this case, Sachs refused to authorize Mr. Thorsen's medical treatment after Dr. Clark discharged him in June of 1995. As his condition persisted, Mr. Thorsen chose to pursue additional medical treatment despite Sachs' refusal to authorize it. In this case, the Commission found that Mr. Thorsen's medical treatment, including that received at Trinity Lutheran, was related to Mr. Thorsen's September 1994 work accident and was reasonable and necessary. As pointed out by the Commission in its award, "when the employer refuses to provide necessary treatment, claimant is entitled to an award of compensation for the expenses he has incurred." Sachs does not argue that the treatment was not necessary; instead, it argues that when Trinity Lutheran chose to submit a request for direct payment under § 287.140.13(6), such action resulted in Trinity Lutheran becoming the real party in interest concerning that claim for Mr. Thorsen's medical expenses incurred there. Thus, Sachs argues that pursuant to § 287.140.4, which states in relevant part that "[t]he employee shall not be a party to a dispute over medical charges," Mr. Thorsen lacked standing to pursue obtaining an award for those expenses. We disagree.

Section 287.140.13(6), which authorizes health care providers to file claims for direct payments, states:

A hospital, physician or other health care provider *whose services have been authorized in advance by the employer or insurer* may give notice to the division of any claim for fees or other

charges for services provided for a work-related injury that is covered by this chapter, with copies of the notice to the employee, employer and the employer's insurer. Where such notice has been filed, the administrative law judge *may* order direct payment from the proceeds of any settlement or award to the hospital, physician or other health care provider for such fees as are determined by the division. The notice shall be on a form prescribed by the division.

(Emphasis added.) Section 287.140.4 then directs the Division to establish regulations setting forth "methods to resolve disputes concerning the reasonableness of medical charges, services, or aids." These regulations appear at Title 8, Division 50, Chapter 2.030(2) of the Missouri Code of State Regulations (8 C.S.R. 50–2.030(2)). In this case, Trinity Lutheran filed a direct payment claim under § 287.140.13(6). However, these sections upon which Sachs relies are not applicable to the case now before us because the treatment provided to Mr. Thorsen by Trinity Lutheran clearly was not authorized in advance by either Sachs or its insurer.

We rely on the Missouri Supreme Court's recent opinion in *Curry v. Ozarks Elec. Corp.*, 39 S.W.3d 494 (Mo. banc 2001). In *Curry*, the employer and its insurer argued that the Commission erred in awarding a direct payment for medical services under § 287.140.13(6) RSMo 1994. *Curry*, 39 S.W.3d at 495. The facts differ from our case in that the treatment in *Curry* was found to be authorized in advance by his employer, but the court's reasoning is instructive to the issue now before us. *Id.* at 496. In applying § 287.140.13(6), the court focused on the meaning of the term "authorized" as used therein and emphasized above. *Id.* The *Curry* court held that the evidence supported a finding that the treatment was

"authorized" in advance by Curry's employer, so § 287.140.13(6) was triggered therefore allowing direct payment of medical services. *Id.* Thus, in *Curry* the employer's authorization of the services triggered the medical provider's right to seek direct payment under § 287.140.13(6). Viewed in another way, *Curry* implicitly holds that without the requisite advance authorization, there is no right of a medical provider to seek direct payment from the Division by means of § 287.140.13(6). In other words, because, as found by the Commission, the services provided to Mr. Thorsen by Trinity Lutheran were not authorized, the provisions of § 287.140 pertaining to requests for direct payment and medical fee disputes between employer/insurers and medical providers were not triggered in this case. Therefore, we do not reach the issue of whether Mr. Thorsen lacked standing under § 287.140.4; that section is not applicable to the facts of this case.

Point III is denied.

### Conclusion

Pursuant to § 287.495, we hold that the Commission acted within its powers; the award was not procured by fraud; the facts found by the Commission support its award to Mr. Thorsen; and the record contains sufficient competent evidence to warrant making the award. Thus, we affirm the Commission's award to Mr. Thorsen.

SMITH, P.J., and SMART, J., concur.